Good morning, David Merchant with the Federal Defenders of Montana on behalf of Mr. Hulen. I'd ask to reserve two minutes for rebuttal. Counsel, I'm having trouble hearing you. Can you speak more into the microphone? I can try. Is that better? Thank you. Yes. Again, David Merchant on behalf of Mr. Hulen. I'm with the Federal Defenders of Montana. And I'd ask to reserve two minutes for rebuttal. The court last week issued an order asking us to be prepared to address mootness and not to pander. Good morning, counsel. Can we start the clock? Go for it. And not to pander to Judge Wardlaw in the Verdin decision, but I believe that that decision that was pointed out by the court is, helps us in the dispositive aspect of the mootness question that the government has raised. Verdin was not moot. And factually, he had completed his prison sentence but had just started his supervised release period. He was in his first year of a three-year term of supervised release. The sentence challenge in that case was to an enhancement which could affect the sentence. And this court has always ruled that the sentence is both the period of incarceration as well as the period of supervised release, just like Mr. Hulen was in. The court in Verdin points to Spencer and Palumbo. And in both of those cases, they found that the issue was moot. And in both of those cases, the individual had completed the prison term and then Spencer completed his period of parole, and then Palumbo finished his supervised release at the time the appeal was sent. So in this case, what Mr. Hulen is arguing is still problematic for him. He has an ongoing issue with his sex offender treatment program and the protocols and the way that the probation department deals with that. So I do believe that the mootness issue, Verdin settles that for us because there is an ongoing issue of continued supervision. Your Honors, the government and I disagree with the standard of review in this case, as you may have noticed. The government believes this is an abuse of discretion. And if we were just arguing to the revocation of his supervised release, the government would be right. It would be abuse of discretion. But what we're arguing here is that for a de novo review, which obviously benefits my client, but more so we had challenges to what gets us to the supervised release violation. First of all, we are arguing there's a constitutional challenge with the Fifth Amendment. We're trying to argue that antelope controls there. What Mr. Hulen is required to do in his supervised release, he has to go to his sex offender treatment program, he has to sign up for it. And apparently there's a contract with that. I don't know what that contract says, but I know some of the results of it are he couldn't go to the mall. That was a violation of his sex offender treatment protocols. He couldn't have a relationship with a consenting adult woman. That was a violation also. So what ends up happening is he is required to truthfully talk to his sex offender therapist. Isn't that an important part of therapy? I think it's an essential part of therapy. So what real serious danger of self-incrimination is there from his talking to his therapist and telling the truth to his therapist? Well, there is no constitutional question if that information stays with the therapist. Stop. That's not the question I asked. What real danger of self-incrimination does he face in what he said? The real consequence is that the information he gave, which was violations of his sex offender treatment program, but not violations of his supervised release, where then he was then forced to write those violations down. He was then forced on Friday, April 21st, to call his probation officer and confess those 22 things that he did. And what future prosecution did that lead to? None. So he didn't face any serious danger of self-incrimination, did he? Well, unless he, as in Antelope's case or as in Barr's case. No, in Antelope, he faced prosecution in the future for crimes he'd already committed. There's none of that here. No, not in this particular case. So the Antelope standard doesn't seem to help you. What is the real danger of self-incrimination? Well, the real danger is that then a therapist kicks him out of the program. Okay. Which is a violation of his supervised release. But that's not – well, how does that get covered? Because Murphy tells us that revocation of probation is not something that the Fifth Amendment privilege applies to. Right. But, Your Honor, you just said – So I'm waiting to find out what's the prosecution he fears. Where's the prosecution? I don't see it. Okay. The prosecution that Hewlin is afraid of at the time is continued – in his mind, he thought he could go back to prison for a failure to complete his supervised release. That was his fear. But the truth is, if anybody is having a conversation with their sex offender therapist and they do have to admit to all prior past crimes or if they're doing something currently, so it's a – I'm asking the court – I'm waiting for what Mr. Hewlin's risk was. Well, he confessed. And you've identified no prosecution that has resulted from this. There was no prosecution. So where does the Fifth Amendment kick in? If they tried to prosecute him – and the only thing I can see is he made reference to marijuana. Right. So if somebody tried to prosecute him for possession of marijuana, maybe there's a Fifth Amendment privilege that would prevent that from being used against him, or almost certainly would be. But nothing else here seems to trigger the Fifth Amendment. So I'm not sure what basis there is for his complaint. Maybe somebody else in some other case can apply antelope. But I haven't heard from you why he should be allowed to apply antelope. Well, that's one of the problems of my argument, is that he was not prosecuted for any of those things. And in fact – And if you concede, as the Supreme Court's decision in Murphy seems to say, that revocation isn't something where the privilege applies, then I don't see his argument. That's fair. I understand that. Let me ask counsel a related question. The Murphy case is a very important case for this case. And there's that footnote 7, which is really bad for you. Yes, it is. Let's just put it on the table. That's a bad footnote for you. I wanted to give you a chance to explain to us, if you have an explanation, maybe you don't, why footnote 7 doesn't apply in this case. How can we navigate around footnote 7 to get to where you want to go? I can't. Fair enough. It's a bad footnote for you. I appreciate that. That is one of the conversations that we've been wrestling with. The reality, though, for an individual who is required to go to sex offender therapy, and one of the goals of sex offender therapy has to be that whatever issues you're facing, you can come up with some tools, some mechanisms to overcome those so that you are not recidivitating. That, I think, is the goal of sex offender therapy, which is also the goal of supervised release. And, sir, as you've so articulated, what is the long term? He goes back. He says, I told my therapist, He's done a lot in two months. I mean, he'd only been out for two months, and he had a lot to report. But that's not a bad thing, except that he gets tossed out of therapy because he's not responding to their program. That's a whole other problem than the problem we have here. Although, factually, what happens is he is released from prison in January, and there's a process to signing it up. He's actually not signed up for sex offender therapy until the end of February, and he doesn't get the, there's a program that goes onto your phone or your computer to monitor the things. So his violations actually occur, for the most part, prior to his actually being into the therapy and having the guardian eyes or whatever the program is. He is well into his therapy. I'm sorry, he is well into his supervised release before he is into his therapy. The therapy, he's about a month into it, and he has realized he is doing all these things that are incorrect, and then he makes the confession on the Friday of the April 21st. The letter goes out kicking him out on Saturday. I assume that the probation department gets that letter on Monday because they file the violations on Tuesday that only include the 22 things he's confessed to. I have about a minute and a half left. Yes, I'd like. Thank you. Good morning. May it please the Court, John Sullivan for the United States. I'd like to start just with the mootness issue before we get going into the merits. I don't think Verdin, in this case, compels the same result, because in Verdin he was only challenging the two-level enhancement for his obstruction of justice that, had this court reversed on that issue, he would have faced a lower guideline range and potentially a lower term of supervised release or a shorter term of supervised release. Isn't that the case here as well? Isn't that the case here as well? His new term of supervised release extends his supervised release longer than his prior term. So he does have a personal stake in the outcome of this. Well, in the government's view, I mean, he got 60 months of supervised release again, as he did in the original term. But Verdin, I think, would be more analogous if Mr. Verdin had challenged not only that, you know, lying to the PSR writer about his true name constituted obstruction, but that had he also attempted to escape from custody pre-sentencing. And then he went up on appeal and only challenged the fact that his lying to his probation officer or to the PSR writer constituted obstruction, but then left out there unchallenged. I don't understand your argument. I mean, as I understand the facts, he previously was on supervised release. He was roped. He served, was it six months, and then continued supervised release. And the new period of supervised release extends longer than the old period would have. So he'll be on supervised release for some period of months beyond when it would have ended before. That's correct. Why doesn't that end the question? Why doesn't that give him a stake that justifies him being able to pursue this? Well, that would be true every time that somebody is revoked from supervised release. But he has out there two unchallenged conditions or two unchallenged violations. And, in fact, even though Mr. Doolin took it. Well, you can argue that it's harmless error in the sense you get the same result. That's not the same as mootness. But we also don't know that for sure because we're not the district court, and everybody agreed that the one that counted the most was the one that we're talking about here. Certainly. And I think the harmless error overlaps with the mootness argument. And so that third violation that Mr. Hewlin has taken issue with, that everybody agreed was the most important violation of the terms of the supervised release, he didn't contest that at the district court either. He may have taken issue with the fact that his sex offender treatment provider had compelled him to write down all of these violations of the terms of his sex offender treatment. But at the end of the day, he admitted that he was terminated from sex offender treatment. And that's really the violation that's important here. And so I think that does make it moot in this case, but also it makes it harmless beyond reasonable doubt because he had two other violations that he didn't contest or he's not contesting on appeal, both of which would have justified his revocation of supervised release under 3583E3. And so even though those other two are not the significant violations that we're talking about here, it was still not an abuse of discretion for the district court to revoke him on those grounds. And Judge Clifton, you're exactly right that the Fifth Amendment doesn't apply to these admissions of non-criminal conduct. Mr. Hewlin never faced a real and appreciable threat of prosecution for admitting that he went to the mall, like Mr. Merchant just said, or that he went to a party where there was alcohol being served. Those are things that even if they are violations of the terms of his supervised release, they're not going to lead to a future criminal prosecution. Counsel, may I ask you a question? Is there no privilege attached to these kinds of therapeutic programs? I have to admit, before I got into the law in this case, it just seemed wrong that you could send someone to therapy where the only way the therapy will really work is if they tell the therapist the truth about what they're doing and start working on their issues. And then the therapist turns around and throws them out of the program for having done these things, and that constitutes the violation. It just seems like there's something wrong with this picture. I mean, how are they going to ever fulfill their therapy in a valid way? Well, I would just say that there are several goals of supervised release, rehabilitation being one of the most important ones, but holding people on supervised release accountable is also an important goal. So Mr. Hewlin seeks out the benefits of that. What about the goal of therapy? That's what I'm asking about. Doesn't this turn the therapy on its head if everything you're going to tell your therapist is going to go right back to the court? I think it certainly would, and candor is certainly to be encouraged during treatment. But Mr. Hewlin, he really seeks just the benefits, the rehabilitative benefits of supervised release and treatment in general without wanting to suffer the burdens or the consequences of the violations of his conditions of treatment. And frankly, before the court right now, we just have those three violations, and oftentimes when people are terminated from sex offender treatment or terminated from their drug and alcohol treatment when they're on supervised release, the reasons being for those terminations don't come before the court. Oh, shouldn't they? I mean, on some level, the court doesn't mean to hand over, I assume the court doesn't mean to hand over to some therapist outside the power of thumbs up or thumbs down. I mean, suppose the therapist said, I don't like your looks. I'm kicking you out of here. Is that a basis for sending the person back to jail because the therapist on some basis that the court couldn't base a decision on decides that I don't like you and so you're out of here? At what level is the therapist's decision reviewable by the court? Well, Mr. Hewlin certainly could have challenged that at the district court and said instead of admitting violation number three, he could have denied that violation, put the government to its burden to prove by a preponderance that he had been kicked out for a legitimate reason from his sex offender treatment. I mean, we heard today that most of the episodes that were on this list that triggered his expulsion from the program were things that actually happened before the therapy program began. So it wasn't like a betrayal or may not have been a betrayal of the therapy program, but things that he did before he really got into therapy. And maybe the court could decide, okay, the therapist's decision was premature. I don't know whether the therapy programs are available, but at some point it does seem odd that as important as it is to encourage candor in therapy, that handing over the authority to the therapist to make the decision in the end isn't right. I totally agree with you. And I think the place to challenge that and to flesh out the record would have been at the district court. So instead of violating that allegation, Mr. Hewlin could have denied it and forced the government to call Mr. Lewis as a witness at the revocation hearing, where we really could have fleshed out the record in that respect. And I don't believe the record is clear that all of the violations occurred prior to the beginning of his treatment. If you look at excerpts of records 72 and 73, Mr. Hewlin's describing how he came to Mr. Lewis and said, I want to talk about the things that I had done that I knew I wasn't supposed to do. He acknowledges that he knew those things were wrong and that he came to Mr. Lewis to describe them. And only at that stage did Mr. Lewis say, okay, well, I want you to write all of your violations down. And that's what we see in excerpts from record 55. I take it, counsel, that if this case were to go back to the district court from us or just because he's still on supervised release, he could always file a petition for modification with the district court, asking the court to change some of his conditions. He certainly could. And he would have to go before the court and make a reason that would compel the court to do that. But in this case, to the extent that he's challenging the constitutional violations that underlie that third violation, in the government's view, he's essentially waived that, that the constitutional violations are not before the court because he moved following his initial appearance to excise out in order to strike all of those violations that he admitted to Mr. Lewis. And in response, the United States Probation Office did exactly that, and they removed all of those violations from his final petition. And so that second amended petition, he admitted outright to all three of them. And there is a conceptual difference in terms of what the underlying violations are and what the final end result is in being terminated from supervised release. And so, for example, Judge Wardlaw's concerns about this is your therapist but it's actually, in a sense, an agent for the Probation Office, which is a very awkward position for a therapist to be in. That is something, as far as you're concerned, that they could raise that with the district court. Since the district court has jurisdiction over this case, they could raise that very point and ask for a modification on that. Absolutely. And so at the end of the day, in the government's view, the Fifth Amendment does not apply to these compelled admissions of non-criminal conduct. The district court did not abuse its discretion in revoking Mr. Hewlin given the three admissions of the supervised release. And unless there are any further questions, the government would simply ask that this court affirm. Okay. Thank you very much, counsel. Thank you. Just so that I guess I get this time sequencing correct, Mr. Sullivan is actually absolutely correct. What happens is the probation department files their original supervised release violation one business day after he confesses these things to his therapist. He is then arrested. We have the original petition. About two weeks later, the probation department adds, they amend their supervised release adding being kicked out of sex offender therapy. We have issue over discovery that goes on for about a month. We ask for the records. Those are never turned over. Then I file the motion to strike the 22 allegations. And it's not the government that dismisses those allegations. It's the probation department files a second amended petition. And at that time, they take everything out. But the truth is he had been kicked out of sex offender therapist. The basis of that we disagree with. But the truth is he was kicked out. He had acknowledged and admitted that. I don't think there's any district court judge in the Ninth Circuit in the United States who would send somebody to prison for getting a better job and for not paying their $100 special assessment. He went to prison because he got kicked out of sex offender therapy. He got kicked out of sex offender therapy because the sex offender therapist said so, and the probation department followed suit. That's what this case is about. Thank you very much, Your Honors. Thank you, Counsel Booth, for your argument. This matter is submitted.
judges: Wardlaw, Clifton, Owens